Steven GOLDMAN, on behalf of himself and all others similarly situated, Plaintiff-Appellant,

v.

G.C. BELDEN, Jr., Martin F. Birmingham, Jack C. Corey, Jr., Robert V. Gianniny, Frank M. Hutchins, Albert J. McMullen, Albert J. Montevecchio, Ernest I. Reveal, John R. Sykes, Robert F. Sykes, Sykes Datatronics, Inc., Defendants,

G.C. Belden, Jr., John R. Sykes, Robert F. Sykes and Sykes Datatronics, Inc., Defendants-Appellees.

No. 19, Docket 84-7273.

United States Court of Appeals, Second Circuit.

Argued Oct. 11, 1984.

Decided Feb. 12, 1985.

Melvyn I. Weiss, New York City (David J. Bershad, Jerome M. Congress, Jeremy Heisler, Milberg Weiss Bershad Specthrie & Lerach, New York City, Handelman & Witkowicz, Rochester, N.Y., Leonard Barrack, Gerald J. Rodos, Barrack, Rodos & Bacine, Philadelphia, Pa., on brief), for plaintiff-appellant.

Kenneth A. Payment, Rochester, N.Y. (A. Paul Britton, Jr., Stuart B. Meisenzahl, Harter, Secrest & Emery, Rochester, N.Y., on brief), for defendants-appellees.

Before FEINBERG, Chief Judge, and MANSFIELD and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Steven Goldman appeals from a judgment of the United States District Court for the Western District of New York, Michael A. Telesca, *Judge*, dismissing his amended complaint charging defendants Sykes Datatronics, Inc. ("Sykes" or the "Company"), and three of its officials with having made material misrepresentations and omissions, in violation of § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) (1982), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1984), promulgated thereunder. In an opinion reported at 580 F.Supp. 1373 (1984), the court dismissed the amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) on the grounds that it failed to state a claim under the 1934 Act or Rule 10b–5 and failed to plead scienter adequately. Pursuant to Fed.R.Civ.P. 11, the court awarded costs and attorney's fees of $2,500.00 to defendant John R. Sykes on the ground that plaintiff's allegations against John Sykes lacked a sufficient factual and legal foundation. For the reasons below we conclude that the amended complaint adequately stated a claim against all defendants-appellees under § 10(b) and Rule 10b–

5. We therefore vacate both the dismissal and the imposition of sanctions, and we remand the case for further proceedings.

## I. BACKGROUND

### A. *The Amended Complaint*

The amended complaint (hereafter referred to as the "Complaint"),[1] filed as a class action on behalf of Goldman and all others who purchased common stock of Sykes during the period May 7, 1982, through August 30, 1982 ("class period"), asserted, in essence, that Sykes and certain of its officials had, during the class period, disseminated very positive forecasts about its operations which were materially misleading to the investing public. In addition to Sykes, the Complaint named as defendants Robert F. Sykes, Sykes's Chairman and Chief Executive Officer; G.C. Belden, Jr., its President and Chief Operating Officer and a director; and John Sykes, a vice president and director. The Complaint included the following allegations.

Sykes, a company that designed, manufactured, and marketed microcomputer systems used in information processing and telecommunications, purveyed two principal lines of products. The "Comm-Stor" line, which enabled businesses to record information relating to outgoing telephone calls, was introduced successfully in 1978, following which Sykes's sales and earnings per share effectively doubled in each of its fiscal years until 1982. The other product line, called "InnVoice," was introduced in 1982. InnVoice was designed to aid hotels in recording their guests' long-distance calls. Sykes expected to market this product through AT & T, as it had marketed its previous products. The Complaint asserted that a number of material misstatements and omissions were made by defendants in a series of documents disseminated by the Company during the class period.

The Complaint alleged, *inter alia*, that a May 7, 1982 letter to shareholders within the Sykes 1982 Annual Report for the fiscal year ending February 28, 1982 ("Shareholder Letter") attributed a disappointing first quarter of fiscal 1983 to regulatory delays relating to tariffs filed by AT & T; stated that the Company expected to begin shipping InnVoice in volume during the second quarter of fiscal 1983 (Complaint ¶ 32(b)); and stated that Sykes expected 1983 to be a year of strong growth in sales and earnings (*id.* ¶ 32(a)). At the 1982 annual meeting, held on June 16, 1982, Robert Sykes stated, *inter alia*, that although Sykes had some competition with respect to InnVoice, the Company expected to be the dominant supplier in the market. (*Id.* ¶ 34(c).) He stated that the Company was "geared up to do a lot more business than [it did] last year. And we are going to be doing it." (*Id.* ¶ 34(d).) In estimating the amount of growth expected for the Company, he stated that the Company wanted "orderly growth," avoiding ups and downs, and was aiming for "40 or 50% [growth], or better," which industry analysts and observers considered a good rate of growth. (*Id.*) The Complaint alleged that at the annual meeting Belden stated that the breakup of AT & T would "create increasing opportunities" for Sykes and be favorable to Sykes, and that however AT & T was split, the resulting Bell companies would continue to be major customers of Sykes. (*Id.* ¶¶ 34(a), 44(a).) The remarks of Robert Sykes and Belden at the annual meeting were transcribed by Sykes ("Meeting Transcript") and distributed to its shareholders and to the investing public. (*Id.* ¶ 34.)

Sykes's report for the first quarter of fiscal 1983, signed by Belden and Robert Sykes and disseminated on or about June 28, 1982, did nothing to make less positive the predictions made in the Shareholder Letter and the Meeting Transcript. It reiterated that the outlook was for good growth in the remainder of fiscal 1983. (*Id.* ¶ 35.)

---

**1.** Goldman's original complaint had been dismissed, without prejudice, pursuant to defendants' motion to dismiss for failure to comply with Fed.R.Civ.P. 9(b). *See* 98 F.R.D. 733 (W.D. N.Y.1983).

The Complaint alleged that the defendants' positive predictions for the Company's good fortunes in the marketing of InnVoice were made falsely or with reckless disregard for the truth because the defendants knew or should have known, *inter alia*, (1) that InnVoice was to be marketed at a competitive disadvantage because (a) AT & T could not sell the equipment but was required to lease it, (b) AT & T was required to lease it at published tariff rates rather than at negotiated rates, and (c) the cost of a two-year lease would be no less than the price to purchase a competing system, thereby leading most customers to choose a competing system rather than InnVoice (*id.* ¶¶ 29(b) and (c)); (2) that many hotels already had in place front desk computer equipment for recording other charges and that InnVoice was not compatible with that equipment, although some competing products were (*id.* ¶ 29(e)); (3) that InnVoice, unlike other systems, could not calculate charges for international telephone calls, and this would limit InnVoice's acceptance in gateway cities such as New York, San Francisco, Los Angeles, and Miami (*id.* ¶ 29(f)); and (4) that any upgrading of InnVoice, even if there were no additional charge to customers, would be far slower than any upgrading by private competitors because of the requirement that AT & T obtain new tariff approvals for any new features (*id.* ¶ 29(d)). The Complaint also alleged that Sykes had no reasonable basis for its projections of InnVoice sales because (1) unlike other Sykes products, InnVoice was not to be sold to AT & T for its internal own use; hence past experience could not be an adequate guide; and (2) Sykes had made no independent survey of the needs of hotel and motel owners. (*Id.* ¶ 44(d)(ii).) The Complaint also repeatedly asserted that it was not realistically possible for defendants to have predicted success with InnVoice because the effect of the dismantling of AT & T was gravely uncertain. (*Id. passim.*)

Goldman alleged that he and others, relying on the representations of the defendants, purchased Sykes common stock at prices that were artificially inflated by those recklessly favorable statements. (*Id.* ¶ 48.) Goldman purchased 1,000 shares of the stock on August 26, 1982, at a price of $15.50 per share. (*Id.* ¶ 5.) The Complaint alleged that during the period that the class members were buying Sykes common stock, John Sykes and Robert Sykes, who were in possession of information revealing that the optimistic projections were unfounded, sold, respectively, 40,000 and 29,000 shares of Sykes common stock at those artificially high prices; in addition, Belden sold 400 shares during the class period and had sold 10,000 shares shortly prior to that period. (*Id.* ¶¶ 36, 47.)

On August 30, 1982, the Company issued a press release stating that the expected growth in sales of its recently introduced products had not materialized; that sales for the quarter ending August 31, 1982, would be even lower than those of the first quarter (which it had characterized as sluggish but improving); and that sales for the year 1983 would be approximately $50,000,000, some $13–18,000,000 lower than the volume of annual sales projected some two months earlier (an increase over 1982 of 10% rather than the targeted 40 or 50% or better). (*See id.* ¶¶ 33, 34(d), 37.) The August 30 announcement caused the market price of Sykes common stock to drop precipitously, from $13.00 per share to $7.50 per share in one day. (*Id.* ¶ 38.) Sykes's second-quarter report to shareholders attributed the low sales and earnings to the low rate of sales to the Bell Companies. (*Id.* ¶ 39.)

### B. *The Decision Below*

Defendants moved (1) pursuant to Rule 12(b)(6) for the dismissal of the Complaint for failure to state a claim on which relief may be granted, (2) pursuant to Rule 9(b) for failure to plead with particularity the circumstances constituting the claims of fraud, and (3) pursuant to Rule 11 for an award of costs, including attorney's fees, on the ground that plaintiff had no sound factual basis for the allegations of the Complaint. Defendants' motions relied on "all papers and memoranda [t]heretofore

submitted" in the action. The district court granted the motions to dismiss and granted the motion for sanctions with respect to John Sykes.

The court granted defendants' Rule 12(b)(6) motion in part on the basis of statements found in the Sykes annual report and other Sykes corporate documents, ruling that

> [b]ecause copies of all of these documents are presently before the Court, having been submitted on defendants' original motion, and because their authenticity and accuracy have not been questioned, they may properly be considered on this motion in determining whether the amended complaint fairly states a claim under Rule 10b–5. Cf. *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 113 (2nd Cir.1982); *Denton Construction Co. v. Missouri Portland Cement Co.*, 507 F.Supp. 53, 54 (E.D.Mo. 1981).

580 F.Supp. at 1378. After reviewing the substantive requirements of § 10(b) of the 1934 Act and Rule 10b–5,[2] the court concluded that the Complaint did not adequately plead fraud or scienter.

Taking the view that it was entitled to "assume that the amended complaint now before the Court is a model of clarity and precision and that plaintiff has now set forth all of the factual allegations he can muster in support of his claim," 580 F.Supp. at 1378, the court concluded that the Complaint did not meet the requirements of Rule 12(b)(6) because the omissions and misrepresentations attributed to the defendants amounted to no more than faulty prognostication. It found principally (1) that "[t]o the extent that plaintiff alleges that some of these problems were inherent in marketing products with AT & T, it is far from clear whether they were in fact problems," 580 F.Supp. at 1379–80 (footnote omitted); (2) that even if the Complaint were read as asserting that the alleged " 'problems' should have been disseminated to the public, the amended complaint does not state a claim that defendants failed to do so," *id.* at 1380 (footnote omitted); (3) that the Sykes annual report and first quarter report were "replete with references to the amount of business previously conducted with AT & T and the tariffs" AT & T was required to file in order to sell the Company's products, and thus Sykes's dependence on AT & T and the peculiarities involved in marketing through AT & T were disclosed, *id.* at 1379; (4) that if plaintiff sought to "indict defendants for failing to correctly forecast the outcome of the AT & T anti-trust settlement, the allegations are spurious," *id.;* (5) that the Complaint "attack[ed] the corporate directors for their failure to perceive problems with the AT & T breakup and with their INNVOICE product itself," *id.* at 1380; and (6) that the estimate given of 40–50% growth for the fiscal year 1983 "must be viewed in the context of Sykes' past earnings history," and that in light of the Company's past annual doubling of its sales and earnings, the 40–50% estimate could actually be viewed as a pessimistic forecast, *id.* at 1379.

The court concluded that the Complaint thus did not state a claim under the securities laws and that "[d]efendants' state-

---

**2.** Section 10(b) makes it unlawful for any person

> [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1982). Rule 10b–5 provides, in pertinent part, as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> . . . .
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1984).

ments and alleged omissions, when viewed in this light, do not provide the requisite 'probable cause' necessary for the issuance of a 'judicial search warrant' into Sykes' corporate management." 580 F.Supp. at 1380 (quoting *Goldman v. Singer Co.*, 89 F.R.D. 436, 440 (S.D.N.Y.), *aff'd mem.*, 661 F.2d 908 (2d Cir.1981)).

The court further found that the Complaint's allegations of scienter failed to satisfy the requirements of Rule 9(b), in that

> [a]lthough plaintiff has specifically identified the alleged "misrepresentations" made by defendants, he has only in the most general terms alleged that defendants had knowledge of the falsity of these statements and the basis for that knowledge. Such knowledge is critical and cannot be inferred merely because defendants were directors and officers of the corporation.... This deficiency is fatal and mandates dismissal of the complaint.

> Plaintiff has also failed to indicate when defendants allegedly came into possession of this crucial information concerning the marketing problems with INNVOICE and how that knowledge was acquired. Although at this stage of the litigation plaintiff cannot be expected to plead actual knowledge by defendants, plaintiff must at least "supply a factual basis for his conclusory allegations regarding that knowledge."

580 F.Supp. at 1380–81 (footnote and citations omitted).

Finally, the court concluded that the inclusion of John Sykes as a defendant was not based on any well-grounded claim of securities fraud. It stated that the only allegation against John Sykes was that he sold 26% of his Sykes common stock during the class period. The court found this allegation insignificant since the documents submitted by the defendants made it clear that John Sykes was retiring from the Company during the class period, "making it not only reasonable, but quite logical that he would liquidate some of his securities." *Id.* at 1381 (footnote omitted). The court awarded John Sykes costs and attor-

ney's fees in the amount of $2,500 pursuant to Rule 11, against Goldman and his attorneys jointly and severally.

This appeal followed.

## II. DISCUSSION

On appeal, Goldman challenges the court's rulings as to the sufficiency of his Complaint under Rules 12(b)(6) and 9(b) and the imposition of sanctions under Rule 11. Our review of the record persuades us that these challenges have merit. As discussed below, the court did not follow the proper procedures under Rule 12(b)(6); it construed the Complaint unduly narrowly; and its conclusions in several instances constituted factual decisions more appropriate to a resolution of the matter on its merits by the trier of fact than to a ruling on a Rule 12(b)(6) motion.

### A. *Proper Procedure Under Rule 12(b)(6)*

We begin with a few observations with respect to the proper considerations in ruling on a motion to dismiss pursuant to Rule 12(b)(6). First, the district court appears to have believed that it should construe the Complaint quite strictly, as if it were "a model of clarity and precision." While a plaintiff who has once taken advantage of the opportunity to amend his complaint in light of defects to which his attention has been drawn should be able to achieve some clarity and precision, and may properly be denied yet another opportunity to amend, it is nevertheless the rule that the court should not dismiss the complaint pursuant to Rule 12(b)(6) unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) (footnote omitted).

Second, a Rule 12(b)(6) motion is addressed to the face of the pleading. The pleading is deemed to include any document attached to it as an exhibit, Fed.R. Civ.P. 10(c), or any document incorporated

in it by reference. *Denton Construction Co. v. Missouri Portland Cement Co.*, 507 F.Supp. 53, 54 (E.D.Mo.), *vacated on other grounds*, 659 F.2d 873 (8th Cir.1981) (per curiam); *see* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1327, at 490–91 n. 18 (1969); *id.* § 1327, at 125 n. 18 (Supp.1984) (citing *Denton Construction Co. v. Missouri Portland Cement Co.* and *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 113 (2d Cir.1982) ). Rule 12(b) provides that to the extent that the court decides to consider matters outside of the complaint in ruling on a motion pursuant to Rule 12(b)(6), "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Although this provision is not applicable to motions under other rules, it is mandatory with respect to motions pursuant to Rule 12(b)(6). *E.g., Carter v. Stanton*, 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972) (per curiam) (Where "matters outside the pleadings were presented and not excluded by the court[, t]he court were therefore required by Rule 12(b) of the Federal Rules of Civil Procedure to treat the motion to dismiss as one for summary judgment and to dispose of it as provided in Rule 56.").

■ In the present case, in ruling on the Rule 12(b)(6) motion, the district court relied on several documents submitted by the defendants in support of their motion to dismiss. In determining that it could rely on extraneous materials, the court cited *Decker v. Massey-Ferguson, Ltd.* and *Denton Construction Co.*, both of which are inapposite. In *Decker*, this Court merely stated that since the documents were in the record on appeal they were available for our consideration; we did not state that it would have been proper for the district court to consider them on a Rule 12(b)(6) motion without converting the motion into one for summary judgment. In *Denton*, the complaint had incorporated by reference the contract sued upon. The documents relied on in the present case, in contrast, had not been attached to the Com-

plaint as exhibits; nor were they incorporated by reference into the Complaint. The documents here were to some extent quoted, but limited quotation does not constitute incorporation by reference. It was, therefore, improper for the court to consider these documents unless it converted the motion into one pursuant to Rule 56 and gave plaintiff the opportunity to submit affidavits or other materials permitted by that Rule.

It is evident that the court did not provide plaintiff with such an opportunity; indeed, documents other than those relied on by the court had been submitted by plaintiff and defendants in connection with defendants' motion to dismiss the original complaint, and it is plain that the district court excluded those other documents from consideration. The principal document submitted by plaintiff was an affidavit from Richard F. Maguire ("Maguire Affidavit"), a communications consultant, which supports many of the allegations made in the amended complaint as to adverse material facts relating to the competitive status of InnVoice. In response, defendants had submitted an affidavit by Robert Sykes ("Robert Sykes Affidavit") conceding that the facts stated in the Maguire Affidavit were "largely accurate," though disagreeing with Maguire's conclusions. The Robert Sykes Affidavit stated that in the spring and summer of 1982, Sykes was "aware of all the circumstances and uncertainties" alluded to in the Maguire Affidavit "and took them into account in its business planning and in the public pronouncements." In ruling on the motion to dismiss the amended complaint, the court plainly gave no consideration to the Maguire and Robert Sykes affidavits. Once the court decided to rely on some matters outside the Complaint, however, it was improper to exclude from consideration other evidence that had been submitted or might properly be submitted under Rule 56.

■ Finally, we note that the district court apparently believed that it was entitled to look to evidence outside the Com-

plaint because it was to determine whether defendants' alleged statements or omissions could *"fairly* be viewed as manipulative or deceptive within the meaning of the statute." 580 F.Supp. at 1378 (emphasis in original) (citing *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 473–74, 97 S.Ct. 1292, 1300–01, 51 L.Ed.2d 480 (1977)). *Santa Fe,* however, was concerned with whether conduct that involved neither misrepresentation nor nondisclosure, but only a merger for the sole purpose of eliminating minority shareholders, was the proper subject of a claim under Rule 10b–5. The *Santa Fe* Court did not suggest that where the complaint alleged factual misrepresentations and nondisclosures, a Rule 12(b)(6) motion might be used to test whether the complaint's interpretations of the defendants' statements were "fair." The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient. *E.g., Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984).

**B.** *The Complaint's Compliance with Rule 12(b)(6)*

In ruling that the Complaint failed to state a claim on which relief may be granted, the district court concluded (1) that it was not clear that circumstances characterized by the Complaint as adverse facts were really problems; (2) that the Complaint did not state a claim that the problems, if they were problems, were not disclosed to the public; (3) that disclosure of other facts satisfied defendants' disclosure obligations; (4) that the statements and omissions attributed to the defendants amounted to nothing more than faulty prognostications because of their "failure to perceive"; and (5) that defendants' growth estimates could actually be viewed as pessimistic rather than optimistic. Each of these conclusions was flawed as a basis for dismissing the Complaint pursuant to Rule 12(b)(6).

**1.** *"Problems"*

To the extent that the court dismissed the Complaint because of its view that what the Complaint characterized as adverse facts might not have been real problems, its analysis was doubly flawed.

 First, the Complaint alleged that the facts not disclosed were problems. The court's view that the facts may not really have been problems was not so much a ruling as to the adequacy of the pleading as it was an evaluation of the materiality of the nondisclosures. Materiality is a mixed question of law and fact, *e.g., TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976), and a complaint may not properly be dismissed pursuant to Rule 12(b)(6) (or even pursuant to Rule 56) on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance. Even if the court itself had felt that the facts characterized by the Complaint as adverse were clearly *not* problems (which is farther than the court went), it could not properly, on this Complaint, determine as a matter of law that reasonable minds could not differ as to whether the undisclosed facts would be important to a reasonable investor.

Second, to the extent that the court wished to go beyond the face of the Complaint, it should have considered the evidence in the record that the defendants themselves considered the pleaded circumstances to be problems. For example, the Robert Sykes Affidavit, after citing the Maguire Affidavit's mention of the legal restrictions on AT & T's ability to sell, rather than lease, products and on flexibility and product upgrading, stated that Sykes "ha[d] long been familiar with these marketing *problems,"* had successfully marketed other products under the same restrictions, and "was aware that these same *handicaps* would apply to the marketing of InnVoice." (Robert Sykes Affidavit ¶ 6 (emphasis added); *see also id.* ¶ 5

(Sykes "was acutely aware" of the "obstacle" posed by AT & T's obligation to obtain regulatory approvals).)

### 2. Allegation of Nondisclosure

■ The court's statement that the Complaint did not "state a claim that the defendants failed to" disclose these problems to the public, 580 F.Supp. at 1380, is not entirely clear. If, by this, the court meant that the Complaint failed to state a claim on which relief may be granted with respect to defendants' nondisclosures, we disagree, for the reasons under discussion. If, instead, the court meant that the Complaint did not claim that the defendants failed to make disclosures, we disagree because the entire thrust of the Complaint is that there were problems with the capabilities and marketing of InnVoice that were not disclosed to the investing public. Thus, the Complaint alleged that defendants had access to adverse nonpublic information that they acted to conceal (Complaint ¶ 11); that defendants "profited by failing to disclose adverse facts" that would have tended to qualify or put a different light on their public statements (*id.* ¶ 36); and that the defendants made "*unqualified* optimistic reports and statements" (*id.* ¶ 31; emphasis added), by which the Complaint implied that adverse facts were not disclosed. Although these paragraphs did not expressly cross-reference to ¶ 29, which detailed most of the alleged problems, it is a fair inference that the problems specified in ¶ 29 were among those allegedly concealed. (*See, e.g., id.* ¶ 34(c).)

### 3. Adequate Disclosures

■ The district court appears to have found that the defendants' public statements with regard to the Company's marketing prospects in light of the imminent dissolution of AT & T were sufficient to meet the defendants' obligations, stating that the Company's reports were "replete with references" to AT & T's obligation to file tariffs and to the amount of business Sykes had conducted with AT & T in the past. The court concluded that Sykes's "dependence" on AT & T was thus disclosed. This was based on an unduly narrow view of plaintiff's Complaint. Plaintiff did not allege simply that defendants failed to disclose Sykes's dependence on AT & T or AT & T's subjection to regulation; he alleged that defendants made positive predictions as to the Company's future marketing operations in light of the imminent AT & T breakup (that the breakup would be favorable to Sykes and create "increasing opportunities" for Sykes), when at best the future situation was unclear. The court's conclusion that such disclosures as were made were sufficient to dispel whatever aura of certainty might have been created by the representations actually made appears, once again, to be a judgment as to the materiality of the alleged misrepresentations and nondisclosures. While it may be that a jury would agree with that conclusion, we think it an inappropriate judgment to make as a matter of law.

### 4. Failure To Perceive and Faulty Prognostication

■ The court's conclusion that the Complaint failed to state a claim because it attacked defendants' "failure to perceive," and therefore faulted them merely for failing to make accurate predictions, also viewed the Complaint unduly narrowly. While it is true that not all predictions are actionable and that liability probably should not be imposed on the basis of words that "bespeak caution," *Polin v. Conductron Corp.*, 552 F.2d 797, 806 n. 28 (8th Cir.), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977), the claim here is that there was no note of caution in the defendants' statements and that defendants knew caution was warranted. The Complaint alleged that defendants made a series of very positive predictions as to the probable success of InnVoice without qualifications, while they knew of the infirmity of the Company's reliance on AT & T and knew of many flaws in InnVoice, which were detailed in the Complaint; it alleged that defendants' knowledge of the industry and of the product

must have caused them to have some reservations about the ability of the Company to fulfill these predictions.

We do not find defendants' statements to be quite as unqualified as the Complaint alleged. The Company stated, for example, not that it *would* increase growth by 40–50%, but that it would *"try to* be doing something in the order of 40 or 50%" growth. (Emphasis added.) Nonetheless, the mere mention of such figures (*see* Part II.B.5. *infra*) and the Company's statements considered as a whole could have conveyed to a reasonable investor the picture of a quite rosy future for the Company. Thus, Robert Sykes stated that the Company was "geared up to do a lot more business than [it did] last year. And we are going to be doing it"; and after reviewing some of the other competitors in the industry, he stated that the Company expected to be the dominant supplier in the market. (Complaint ¶ 34.) The Company's Shareholder Letter downplayed the disappointing performance of the company during the first quarter of fiscal 1983 and stated that in the second quarter Sykes expected to begin "shipping" InnVoice in volume. (*Id.* ¶ 32(b).) Arguably the Company's use of the word "shipping" rather than "selling" suggested that the orders were in hand and that they need only be filled for the Company to meet defendants' bullish predictions; the Complaint alleged that the orders were neither firm nor imminent. (*Id.*)

Given defendants' positive predictions and the allegations of knowledge of the undisclosed negative factors (*see* Part II. C.2. *infra*), we conclude that the Complaint adequately stated a claim under § 10(b) and Rule 10b–5. *See Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156 (2d Cir.1980):

> Liability may follow where management intentionally fosters a mistaken belief concerning a material fact, such as its evaluation of the company's progress and earnings prospects in the current year.

*Id.* at 164 (footnote omitted); *Marx v. Computer Sciences Corp.,* 507 F.2d 485, 489–90 (9th Cir.1974) (statement that company "expects to exceed the revenue and profit forecast" is a type of statement actionable under § 10(b) and Rule 10b–5).

### 5. *Optimism vs. Pessimism*

■ Finally, the court's view that an estimate of 40–50% growth in the current fiscal year "could be viewed" as a pessimistic forecast, in light of the past annual doubling of sales and earnings, was plainly a conclusion as to the materiality of defendants' estimate. Yet it cannot be said as a matter of law that an estimated growth of 40–50% would be viewed by investors as a negative factor. If a company's sales in year X + 1 were twice what they were in year X, and in year X + 2 they were 50% more than in year X + 1, the dollar increases in years X + 1 and X + 2 would be exactly the same. It can hardly be said that a reasonable investor could not find attractive the prospect of a second consecutive year of $21,000,000 increase in sales.

## C. *The Complaint's Compliance With Rule 9(b)*

### 1. *Fraud*

■ The district court ruled that the Complaint met the requirements of Rule 9(b) with respect to specificity in the pleading of fraudulent representations. 580 F.Supp. at 1380 ("plaintiff has specifically identified the alleged 'misrepresentations' made by defendants"). Defendants nevertheless urge us to uphold the dismissal on the ground that the Complaint's allegations of false representations and misleading omissions "fail[ ] to raise an inference of fraud" as required by Rule 9(b). We find this position without merit. We agree with the district court that the Complaint adequately specified the statements it claimed were false or deceptively incomplete; it gave particulars as to the respect in which plaintiff contended the statements were fraudulent; it detailed the time and place at which the statements were made; and it identified the defendants charged with hav-

ing made those statements, either directly or as controlling persons or aiders and abettors. There can be no doubt that the Complaint gives each defendant notice of precisely what he is charged with. No more is required by Rule 9(b). *See Denny v. Barber*, 576 F.2d 465, 469 (2d Cir.1978).

To a great extent defendants' arguments on appeal simply mirror the district court's view that the undisclosed facts were not material. For the reasons discussed above, that view was not a proper basis for dismissal of the Complaint.

### 2. *Scienter*

The district court found that the Complaint failed to meet the specificity requirements of Rule 9(b) because it did not indicate the timing and provenance of defendants' alleged knowledge of the adverse material information concerning InnVoice and did not indicate any factual basis for the conclusory allegations regarding that knowledge. This ruling was ill-founded since Rule 9(b) allows intent and knowledge to be averred generally and since the Complaint alleged a sufficient factual basis to support its allegations of scienter.

Rule 9(b) reads as follows:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, *intent, knowledge, and other condition of mind of a person may be averred generally.*

(Emphasis added.) Thus, great specificity was not required with respect to the allegations of knowledge and scienter, and we conclude that the Complaint adequately met the requirements for the allegation of those elements. First, it alleged that during the class period each defendant had access to the information allegedly withheld from the class. (Complaint ¶¶ 11, 36.) Further, it alleged that the representations complained of "were made with knowledge or reckless disregard of the grave uncertainties and problems concerning future sales of" InnVoice (*id.* ¶ 31); and it alleged that John Sykes and Robert Sykes profited from defendants' bullish statements by selling large blocks of their common stock holdings in Sykes (*id.* ¶ 36). As for the factual basis for the allegations of knowledge, the Complaint alleged that the defendants portrayed themselves in their public statements during the class period as persons highly knowledgeable about the industry and Sykes's role in it (*id.* ¶ 46(a)); it alleged that at the June 16, 1982 annual meeting, Belden made statements as to the favorable prospects for Sykes in light of the break-up of AT & T that bespoke some familiarity with competitive conditions, and that Robert Sykes discussed some of the competitors in the industry in detail and opined that Sykes would be the dominant supplier (*id.* ¶¶ 34(a) and (c)).

Thus, the Complaint plainly alleged that the defendants had or had access to the withheld information during the class period, and suggested that the factual basis for attributing that knowledge to them during the period had come from defendants' own public statements and self-portrayals as industry-wise businessmen; the additional implication of the Complaint is that the alleged failure to qualify the bullish statements was intended to permit individual defendants to profit from an inflated market price before the truth became known. No more was required of plaintiff at the pleading stage.

### D. *The Complaint Against John Sykes and the Imposition of Sanctions*

The district court found the Complaint's allegations to be totally insufficient against John Sykes and so without foundation that an award of costs, including attorney's fees, was appropriate. In reaching its conclusion, the court stated that the Complaint contained "only one specific allegation" against John Sykes, *i.e.*, the fact that he had sold some 26% of his Sykes common stock holdings during the period in question. 580 F.Supp. at 1381. The court noted that the Sykes first-quarter report for 1983 stated that John Sykes was retiring during the class period and the court found it "reasonable" and "logical" that John Sykes would liquidate a significant

portion of his stock holdings in connection with his retirement. *Id.* We conclude that the Complaint was sufficient to state a claim against John Sykes and that the district court's conclusions impermissibly reached beyond the scope of the Complaint, and, indeed, invaded the province of the trier of fact.

The Complaint's allegations against John Sykes were not limited to the assertion that he sold a block of his Sykes common stock. The Complaint alleged that the unqualifiedly optimistic statements were published and disseminated by "the defendants." (Complaint ¶ 31.) The attribution of the statements to all defendants was supported by allegations that (1) the challenged statements were made in corporate documents distributed by Sykes (*id.* ¶¶ 32–35) (For example, oral statements made by Belden and Robert Sykes were transcribed by the Company and distributed to the public, *see id.* ¶ 34.); (2) all of the individual defendants were officers, directors, and controlling persons of Sykes (*id.* ¶¶ 7–11); and (3) "the individual defendants" caused Sykes to "engage in the unlawful acts and conduct alleged herein" (*id.* ¶ 11). John Sykes was not simply an outside director who would not have been involved in the day-to-day operations of the Company. Rather, he was a vice president and, as the district court opinion noted, a founder of the Company. The Complaint asserted that

> each of the individual defendants had access to the adverse non-public information about the operations and future business prospects of Sykes as alleged herein and acted to conceal that information from plaintiff and the members of the class defined herein and the investing public.

(*Id.; see also id.* ¶ 31.)

Thus, the allegation that John Sykes sold a substantial portion of his common stock during the period when the Company was disseminating the allegedly misleading statements must be read in conjunction with the allegations that John Sykes, as a director and an officer of the Company, knew the undisclosed facts and caused the Company to make the challenged statements. The Complaint was sufficient to state a claim against John Sykes.

The district court's reliance on the information found in the Sykes first-quarter report, *i.e.*, that John Sykes was retiring during the class period, as a basis for inferring that his retirement was the reason for his stock sales, has several flaws. First, it relied on facts and assumptions outside of the pleadings, which should not have been considered on a Rule 12(b)(6) motion. Second, assuming that there is no dispute as to the fact and timing of John Sykes's retirement, the question of whether that retirement was the motivation for his stock sales is a question that would be inappropriate for decision even on a summary judgment motion. *See, e.g., Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2d Cir.1984) (questions of knowledge and intent usually inappropriate for decision on summary judgment); *Rodriguez v. Board of Education,* 620 F.2d 362, 365 (2d Cir.1980) (in converting defendants' Rule 12(b)(6) motion into a Rule 56 motion, "the judge was required to draw all reasonable inferences and resolve all genuine disputes in favor of the plaintiff"). Third, the Complaint's allegation as to John Sykes's stock sale is broad enough to encompass not only the implication that John Sykes wanted to sell because he knew the prospects were not rosy, but also the implication that he wanted the market price of the stock inflated so that he could sell at a high price rather than a low one. Hence, even if the court was correct that John Sykes's motivation in selling his stock was to fund retirement activities, plaintiff would doubtless argue that the desire to sell the stock to fund retirement was an incentive for John Sykes to cause the making of inflationary misstatements. Such an implication would give substance to the contention that the alleged misrepresentations and omissions were deliberate.

Thus, not only do we find the Complaint sufficient to state a claim against John Sykes, we find that the district court's inferences as to a possible reason for John Sykes's stock sales invaded the province of the jury and that even those inferences did

not supply a complete answer to the fair import of the Complaint.

The dismissal of the Complaint against John Sykes having been improper, the imposition of sanctions pursuant to Rule 11 cannot stand.

CONCLUSION

The judgment of the district court is vacated and the case is remanded for further proceedings not inconsistent with this opinion.